1  LAUREN E. TATE, SBN 124483
   TATE & ASSOCIATES
2  1321 Eighth Street, Suite 4
   Berkeley, CA 94710
3  Tel: (510) 525-5100
   Fax: (510) 525-5130
4
   Attorneys for Third Party Defendant
5  SANTA ROSA MEMORIAL HOSPITAL

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11 ESTATE OF JEREMIAH CHASS, MARK          CASE NO: CV 08 0111 MMC
   CHASS, YVETTE CHASS, and I.C., a minor,
12 by the through his Guardian Ad Litem,   **DEFENDANT SANTA ROSA**
   YVETTE CHASS,                           **MEMORIAL HOSPITAL'S MOTION TO**
13                                          **DISMISS THIRD PARTY COMPLAINT**
              Plaintiffs,                   **[Fed. R. Civ. Proc. 12(b)(6)]**
14
              vs.
15                                          **Date:  October 10, 2008**
                                            **Time:  9:00 a.m.**
16 COUNTY OF SONOMA, BILL COGBILL,          **Dept:  7, 19th Floor**
   in his individual capacity and in his official
17 capacity as Sheriff for the COUNTY OF
   SONOMA, SONOMA COUNTY DEPUTY
18 SHERIFF JOHN MISTA, SONOMA
   COUNTY DEPUTY SHERIFF JIM RYAN,          **Honorable Maxine M. Chesney**
19 and DOES 1 through 50,

20            Defendants and Third Party Plaintiff's,

21            vs.

22 SANTA ROSA MEMORIAL HOSPITAL,

23            Third Party Defendant.

24

25    **NOTICE OF DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO**
      **DISMISS THIRD PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)]**
26

27        **PLEASE TAKE NOTICE** that on October 10, 2008 at 9:00 a.m. in Courtroom 7 of the

28 above-captioned Court, third party defendant Santa Rosa Memorial Hospital will and hereby

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

does move this Court to dismiss the third party complaint filed by defendants pursuant to Federal

Rule of Civil Procedure 12(b)(6). This motion is made on the grounds that the third party

complaint fails to state facts sufficient to constitute any cause of action against third party

defendant and is based on this notice, the accompanying points and authorities, the complete files

and records in this case and on such other evidence and argument as may be presented at the

hearing on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)]**

### I.    Relief Sought and introduction

Pursuant to Fed. R. Civ. Proc. 12(b)(6), third party defendant Santa Rosa Memorial

Hospital asks the court to dismiss the Third Party Complaint without leave to amend for failure

to state facts sufficient to constitute any cause of action.

Sonoma County Sheriff's Department allegedly intentionally shot and killed a mentally

ill teenager, Jeremiah Chass, in front of his family for reasons unrelated to any legitimate law

enforcement purpose. They seek equitable indemnity from Santa Rosa Memorial Hospital, based

on allegations that the Hospital should have treated Jeremiah the night before and that had they

done so, Jeremiah would not have threatened to kill his brother the next morning and the

deputies would not have been summoned.

There are a multitude of reasons why defendants are not entitled to equitable indemnity

from the Hospital in this civil rights shooting death case. Defendants found no equitable

indemnity case involving similar circumstances, no doubt because what defendants seek to do

goes far beyond the boundaries of the law.

First, all claims are barred by the fact that the use of excessive force by Sheriff's deputies

was a superseding cause that relieves the Hospital of liability. There are a number of different

analytical paths that compel this conclusion, both from a causation standpoint and scope of duty

standpoint. Second, defendants do not allege facts that would show the Hospital had any duty to

Jeremiah's family, which bars indemnity for the claims asserted only by the family (second

through fifth claims). Third, an intentional tortfeasor cannot obtain indemnity from a negligent

1  does move this Court to dismiss the third party complaint filed by defendants pursuant to Federal

2  Rule of Civil Procedure 12(b)(6).  This motion is made on the grounds that the third party

3  complaint fails to state facts sufficient to constitute any cause of action against third party

4  defendant and is based on this notice, the accompanying points and authorities, the complete files

5  and records in this case and on such other evidence and argument as may be presented at the

6  hearing on this motion.

7  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY**
8  **COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)]**

9  **I.      Relief Sought and introduction**

10      Pursuant to Fed. R. Civ. Proc. 12(b)(6), third party defendant Santa Rosa Memorial

11  Hospital asks the court to dismiss the Third Party Complaint without leave to amend for failure

12  to state facts sufficient to constitute any cause of action.

13      Sonoma County Sheriff's Department allegedly intentionally shot and killed a mentally

14  ill teenager, Jeremiah Chass, in front of his family for reasons unrelated to any legitimate law

15  enforcement purpose.  They seek equitable indemnity from Santa Rosa Memorial Hospital, based

16  on allegations that the Hospital should have treated Jeremiah the night before and that had they

17  done so, Jeremiah would not have threatened to kill his brother the next morning and the

18  deputies would not have been summoned.

19      There are a multitude of reasons why defendants are not entitled to equitable indemnity

20  from the Hospital in this civil rights shooting death case.  Defendants found no equitable

21  indemnity case involving similar circumstances, no doubt because what defendants seek to do

22  goes far beyond the boundaries of the law.

23      First, all claims are barred by the fact that the use of excessive force by Sheriff's deputies

24  was a superseding cause that relieves the Hospital of liability. There are a number of different

25  analytical paths that compel this conclusion, both from a causation standpoint and scope of duty

26  standpoint.  Second, defendants do not allege facts that would show the Hospital had any duty to

27  Jeremiah's family, which bars indemnity for the claims asserted only by the family (second

28  through fifth claims).  Third, an intentional tortfeasor cannot obtain indemnity from a negligent

1   tortfeasor, and the three civil right claims (first, second and third) allege intentional or

2   deliberately indifferent action.  Finally, the Hospital, which is not alleged to have any

3   involvement in running the Sheriff's Department, cannot have been the actual cause of the

4   alleged *Monell* violations, which is grounded on Sheriff's Department custom, practice and

5   policies.

6   **II.    Allegations of the Complaint**

7         Plaintiffs' complaint essentially alleges that Sonoma County deputies executed a

8   mentally ill teenager, Jeremiah Chass, in front of his family while the teenager was flat on his

9   back in a van.  (Complaint, ¶ 21.)   Plaintiffs allege that Jeremiah's father, Mark Chass, called

10  the Sebastopol Fire Department on March 12, 2007 for EMT medical assistance to transport

11  Jeremiah to the hospital, but the call was routed to the Sonoma County Sheriff's Department,

12  which dispatched Deputies Misita and Ryan to the Chass home.  (*Id.*, ¶ 12.)  Plaintiffs contend

13  that, although Jeremiah had holed up in the family's minivan with a wood-working tool and had

14  been "making irrational statements," his parents had physically restrained him before the

15  deputies arrived.  (*Id.*, ¶ 16.)  On arrival, the deputies pepper sprayed Jeremiah, struck him with a

16  baton, put him in a head lock and then discharged their weapons at him, killing him.  (*Id.*, ¶¶ 19

17  and 21.)

18        The complaint sets out two civil rights claims (42 U.S.C. § 1983) against the deputies

19  alleging the use of excessive force and one civil rights claim against the County, alleging the

20  failure to train deputies to handle encounters with mentally ill persons and/or ratification of the

21  misconduct of the deputies.  (First, Second and Third Claims.)  Two state law claims are asserted

22  for wrongful death and negligent infliction of emotional distress.  (Fourth and Fifth Claims.)

23  **III.   Allegations of the Third Party complaint**

24        Sonoma County defendants' third party complaint alleges Jeremiah had assaulted and

25  threatened to kill his brother with a knife on the morning of March 12, 2007.  (Third Party

26  Complaint, ¶ 12.)  When Sonoma County deputies arrived, they found Jeremiah in a "violent,

27  delusional, and homicidal state, threatening to kill his brother, and armed with a knife."  (*Ibid.*)

28  They contend they justifiably used deadly force against Jeremiah "in response to the threat of

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

3

1 | great bodily harm or death to themselves and others." (*Ibid.*)

2 |     Defendants claim the right to equitable indemnity against third party defendant Santa

3 | Rosa Memorial Hospital ("Hospital"). They allege that the evening before the shooting

4 | decedent's mother, Yvette Chass, called the Hospital and, speaking to an intake coordinator for

5 | the acute psychiatric unit, reported that Jeremiah said he and his mother would die that night at

6 | 1:00 a.m. (Third Party Complaint, ¶¶ 3-4.) Mrs. Chass asked the intake coordinator to speak

7 | with Dr. Prokopis, "a family friend and psychologist," regarding Jeremiah, and the intake

8 | coordinator did so. (*Id.*, ¶¶ 4-5.) Dr. Prokopis allegedly told the intake coordinator he believed

9 | Jeremiah needed "emergency care and an immediate psychological assessment." (*Id.*, ¶ 5.)

10 |     Defendants allege the intake coordinator told both Mrs. Chass and Dr. Prokopis that they

11 | should wait until the morning to have Jeremiah evaluated and that if they brought him into the

12 | emergency room that night, he would likely not be seen. (*Id.*, ¶ 6.) Allegedly as a result of this

13 | conversation, Mrs. Chass did not take Jeremiah to the emergency room that night. (*Id.*, ¶ 7.) It is

14 | not alleged she called 911, contacted the fire or sheriff's department or sought other assistance

15 | for Jeremiah until the following morning.

16 |     Based on these allegations defendants assert the Hospital violated a duty to provide

17 | emergency medical care for Jeremiah pursuant to California Health & Safety Code § 1317. They

18 | contend the violation of this alleged duty, as well as the alleged failure to train the intake

19 | coordinator properly, constituted medical malpractice. (*Id.*, ¶¶ 9-11, 15-16.) They assert that if

20 | Jeremiah had been taken to the emergency room, he "would have received treatment and/or

21 | services that would have prevented his further mental decline." (*Id.*, ¶ 13.) Consequently, he

22 | "would not have assaulted his brother, or threatened to kill his brother on the morning of March

23 | 12, 2007." (*Id.*, ¶ 13.) Defendants maintain that Jeremiah's violent behavior on March 12 was

24 | foreseeable as was the use of force against him by sheriff's deputies. (*Ibid.*)

25 | **III.**   **Argument**

26 | **A.**   **The Use of Excessive Force Was a Superseding Cause**

27 |     Leaving aside for the moment whether Health & Safety Code § 1317 even applies in this

28 | case, the alleged use of excessive force by the sheriff's deputies is a superseding cause that

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

4

1   relieves the Hospital from liability even if the Hospital's alleged negligence was a substantial

2   factor in causing the injuries alleged by plaintiffs.

3        In § 1983 actions, the Ninth Circuit looks to "[t]raditional tort law" to define "intervening

4   causes that break the chain of proximate causation." *Van Ort v. Estate of Stanewich*, 92 F.3d

5   831, 837 (9th Cir. 1996). California applies the rules set out in the Restatement Second of Torts

6   regarding superseding cause. *Stewart v. Cox*, 55 Cal.2d 857, 864 (1961). "A superseding cause

7   is an act of a third person or other force which by its intervention prevents the actor from being

8   liable for harm to another which his antecedent negligence is a substantial factor in bringing

9   about." Restatement 2nd, Torts, § 440. A superseding cause relieves the actor from liability

10  whether or not that person's negligence was a substantial factor in bringing about the harm. *Id.*,

11  § 440, com. b.

12       Witkin extracts the following rule from the principles set out in the Restatement: "Where,

13  subsequent to the defendant's negligent act, an independent intervening force actively operates to

14  produce the injury, the chain of causation may be broken. It is usually said that if the risk of

15  injury might have been reasonably foreseen, the defendant is liable, but that if the independent

16  intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not

17  foreseeable, it is a superseding cause, and the defendant is not liable." 6 Witkin, Summary of

18  Cal. Law (9th ed. 1988) Torts, § 975, p. 366.

19       1.    Whether a Duty Exists Is a Question of Law

20       Whether an intervening act is a superseding cause as a matter of policy is a question of

21  law for the Court to decide. "[A] court's task--in determining 'duty'--is not to decide whether a

22  particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's

23  conduct, but rather to evaluate more generally whether the category of negligent conduct at issue

24  is sufficiently likely to result in the kind of harm experienced that liability may appropriately be

25  imposed on the negligent party." *Ballard v. Uribe,* 41 Cal. 3d 564, 572, n. 6 (1986). "It is the

26  exclusive function of the court to declare the existence or non-existence of rules which restrict

27  the actor's responsibility short of making him liable for harm which his negligent conduct is a

28  substantial factor in bringing about, and to determine the circumstances to which such rules are

1    applicable." Rest.2nd, Torts, § 453. Both duty as well as foreseeability, as a factor in finding

2    duty, are questions of law. *Juarez v. Boy Scouts of America, Inc.,* 81 Cal.App.4th 377, 401

3    (2000) [duty]; *Ann M. v. Pacific Plaza Shopping Center,* 6 Cal.4th 666, 678, 863 P.2d 207

4    (1993) [foreseeability]. "[T]he existence and extent of a defendant's liability is a question of law

5    and social policy." *Brewer v. Teano,* 40 Cal.App.4th 1024, 1035 (1995).

6       The outer bounds of legal causation are for the Court to decide because the existence of

7    legal cause "essentially depends upon whether the policy of the law will extend the responsibility

8    for the conduct to the consequences which have in fact occurred." *Sundance Land Land Corp. v.*

9    *Community First Federal Sav. & Loan Assoc.,* 840 F.2d 653, 663 (9th Cir. 1988) (internal

10    quotations omitted). See also *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n.13

11    (1982). Where an intervening act is not reasonably foreseeable, the defendant's conduct is not

12    deemed the "legal" or proximate cause. *Hardison v. Bushnell,* 18 Cal.App.4th 22, 26 (1993).

13      2.     Considerations in Determining Whether an Intervening Force Is Superseding

14       Section 442 of the Restatement sets out six considerations that are important in

15    determining whether an intervening force is superseding. These are: "(a) the fact that its

16    intervention brings about harm different in kind from that which would otherwise have resulted

17    from the actor's negligence; (b) the fact that its operation or the consequences thereof appear

18    after the event to be extraordinary rather than normal in view of the circumstances existing at the

19    time of its operation; (c) the fact that the intervening force is operating independently of any

20    situation created by the actor's negligence, or, on the other hand, is or is not a normal result of

21    such a situation; (d) the fact that the operation of the intervening force is due to a third person's

22    act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person

23    which is wrongful toward the other and as such subjects the third person to liability to him; (f)

24    the degree of culpability of a wrongful act of a third person which sets the intervening force in

25    motion."

26       The Court in *Martinez v. Vintage Petroleum, Inc.,* 68 Cal.App.4th 695 (1998) distilled

27    these precepts into three tests for determining whether an intervening cause constituted a

28    superseding cause. Intervening negligence will supersede if any of the three tests applies. *Id.* at

1    701. The first test applied the general rule that "superseding cause will be found if both the

2    intervening negligent act and the result are unforeseeable." *Ibid.* The second test provided that

3    "foreseeable intervening ordinary negligence will not supersede but such negligence, if 'highly

4    extraordinary,' will supersede." *Ibid.* Under the third test "a normal, but negligent, intervening

5    response will not supersede but an extraordinarily negligent response will supersede." *Ibid.* In

6    addition, "among other factors important in determining whether an intervening force is

7    superseding are 'the fact that the intervening force is due to a third person's act or failure to act,

8    the wrongful act of a third person, and the degree of culpability of the third person.'" *Ibid*, citing

9    to *Brewer v. Teano, supra*, 40 Cal.App.4th at 1031, fn. 3, and Rest.2d Torts, § 442, subds. (d),

10    (e), (f).)

11         In *Brewer v. Teano, supra,* 40 Cal.App.4th 1024, the Court based its finding of

12    superseding cause on the first three Restatement considerations. Therein, a driver, William

13    Teano, negligently, recklessly and repeatedly drove his car into a car driven by plaintiff. Fearing

14    he would be assaulted by Teano if he pulled over, plaintiff left the scene. Subsequently, he was

15    arrested and prosecuted for felony hit-and-run. Plaintiff sued Teano's estate for damages for his

16    prosecution, among other things. *Id.* at 1027-1028.

17         The trial court sustained a demurrer to this claim, and the appellate court affirmed. The

18    Court explained:

19         As the Restatement and California cases instruct us, we look at what happened
         with the benefit of hindsight. Even from that perspective, it cannot be said that the
20         intervening force consisting of the prosecution of formal criminal charges against
         plaintiff was "foreseeable" from Teano's conduct, however characterized. The
21         harm from that proceeding was different in kind from that which may be expected
         to result from the kind of conduct alleged in this case. (§ 442, com. (a).) It is an
22         extraordinary rather than a normal result of Teano's act. (*Id.*, com. (b).) The
         decision of prosecutors to file against plaintiff, and of the magistrate or grand jury
23         to hold him to answer felony charges, operated independently from anything that
24         Teano did; they cannot be described as a normal result of his negligent driving.
         (*Id.*, com. (c).) Whether Teano's conduct was negligent or deliberate, it would be
25         "an unwarranted extension of liability" [citation] to hold that Teano's estate is
26         liable for these remote official acts of independent public officers. We conclude
27         that, as a matter of law, plaintiff is not entitled to recover for the damages he
28

1    suffered as a result of the filing of criminal charges and the subsequent
2    proceedings in the criminal case.
     *Brewer v. Teano*, 40 Cal.App.4th at 1037.

3        Here, too, the alleged use of excessive force by peace officers was not a foreseeable
4    result of the Hospital's alleged advice to Mrs. Chass. "The virtually unanimous agreement that
5    the liability must be limited to cover only those intervening causes which lie within the scope of
6    foreseeable risk, or have at least some reasonable connection with it, is based upon a recognition
7    of the fact that the independent causes which may intervene to change the situation created by
8    the defendant are infinite, and that as a practical matter responsibility simply cannot be carried to
9    such lengths." *Premo v. Grigg* 237 Cal.App.2d 192, 197 (1965).

10       3.    <u>The General Risk that Jeremiah Might Encounter the Police Is Highly Speculative</u>
11       The California Supreme Court held that when deciding whether an intervening force
12   supersedes, the inquiry is not whether the original actor's negligence created a general risk of
13   harm; rather, the focus is on the kind of harm incurred where the intervening act is negligent and
14   on the mechanism of the harm where the intervening act is criminal. *Wiener v. Southcoast*
15   *Childcare Centers, Inc.,* 32 Cal.4th 1138, 1148, 1150 (2004). In *Wiener*, a man intentionally
16   drove his car through a chain link fence surrounding a daycare center and into a group of
17   children on the playground there. *Id.* at 1143. Plaintiff sued the daycare center alleging that
18   defendants knew the fence, which was three to four feet from a busy roadway, was inadequate to
19   prevent cars from going through it and, based on prior traffic accidents on the roadway in front
20   of the center, it was foreseeable that a vehicle could leave the road and strike the fence. *Id.* at
21   1144. The California Supreme Court upheld the trial court's grant of summary judgment. It
22   found that in reversing the trial court's ruling, the Court of Appeal applied the wrong standard
23   because it looked at whether the playground was "generally vulnerable to errant traffic." *Id.* at
24   1148.

25       This focus was present also in *Federico v. Superior Court*, 59 Cal.App.4th 1207 (1997).
26   Therein, the defendant hired a convicted sex offender who had molested underage boys to
27   supervise to supervise student training at a hairstyling college. *Id.* at 1211.) His job duties
28   involved no regular contact with minors, but he had incidental contact with children who were

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

1   getting their hair cut or visiting their parents who were students at the school. *Id.* at 1211-1212,

2   1216.) The employee got permission from a student at the school to take her son on a Sunday

3   outing, after which he sodomized the child. *Id.* at 1212.

4        The court held that even if the defendant should have known of the employee's prior

5   convictions and "could have foreseen that [the employee's] duties at the hairstyling school would

6   entail some degree of contact" with underage males, "as a matter of law, hiring [the employee]

7   did not constitute a breach of defendant's limited duty to exercise reasonable care" in selecting

8   employees. *Id.* at 1213. Because the employee's prior convictions "did not involve students or

9   customers of the hairdressing establishments" where he had worked, and because there was no

10  particular connection between the employee's abnormal sexual interest in children and his work,

11  nothing in his history would have indicated to defendant that he "posed a threat of harm to

12  minors he might encounter in the course of his work." *Id.* at 1214-1215. "[A]n employer's

13  liability must be determined in the context of the specific duties the work entails." *Id.* at 1215.

14  While it was "foreseeable [the employee] would come into contact with young males" at work,

15  such "unavoidable encounters" could not support a finding of negligent hiring. *Ibid.* The court

16  also rejected the plaintiff's claim for negligent supervision because the defendant had no reason

17  to know or suspect that the employee had engaged in "inappropriate behavior on the job"

18  involving minors prior to the incident in the case. *Id.* at 1216.

19       The general risk that Jeremiah might encounter the police because of his behavior is not

20  the proper focus here. Nonetheless, the speculative nature of that general risk adds to the

21  remoteness between the Hospital's alleged advice and the intervening force and bears some

22  discussion. *Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 775-776 (2001) [mere possibility

23  of causation is insufficient, because causation cannot be based upon speculation and conjecture].

24  Defendants allege that Jeremiah would not have assaulted his brother had he received treatment

25  and, thus, would not have encountered the police. This is nothing more than an attempt to

26  elevate clairvoyant power into legal duty.

27       Two out-of-circuit cases are instructive and in keeping with Ninth Circuit law on

28  causation. Both cases involved § 1983 actions brought against police agencies for failing to

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

1   intervene under circumstances roughly analogous to those in the case at bar.  Both cases found

2   there was no causation as a matter of law.

3       In *Ricketts v. City of Columbia Missouri*, 36 F.3d 775 (8th Cir. 1994), an estranged

4   husband sexually assaulted his wife and murdered his wife's mother. The wife and decedent's

5   husband brought a § 1983 action against the police, alleging that the police had actual and

6   personal knowledge of numerous violent threats by the husband against the wife but failed to

7   arrest him during any of the many police responses to the husband's violations of a TRO the wife

8   had obtained.  *Id.* at 777-778.  The Eighth Circuit rejected the argument that this failure to arrest

9   caused plaintiff injuries. In so holding, the court reasoned that "[t]o find that the injuries caused

10  by Sunny's violent acts of sexual assault and murder would have been avoided had Sunny been

11  arrested for the prior harassment would be an excess in pure speculation, even though it would

12  be "logical to assume that continued official tolerance of repeated misconduct facilitates similar

13  unlawful actions in the future."  *Id.* at 780.  [Internal citations omitted.]

14      In *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50 (1st Cir. 1997), the plaintiffs sued police

15  officers after one of the plaintiffs was stabbed by Francisco, his mentally ill and violent brother.

16  Plaintiffs alleged the police failed to arrest Francisco pursuant to a mandatory temporary

17  detention order, notwithstanding Francisco's threats to stab people and the family's efforts to

18  convince the officers that Francisco was dangerous.  *Id.* at 51.  To establish causation, the

19  plaintiffs relied upon the declaration of a psychologist stating that had Francisco been detained

20  when police had a duty to detain him, he would have received effective treatment which would

21  have prevented the stabbing.  *Id.* at 53.  The First Circuit held that the declaration of the

22  psychologist did not constitute competent evidence of causation.  *Ibid.*

23      The decisions in *Ricketts* and *Rodriguez-Cirilo* make clear that a mere possibility an actor

24  could have prevented a third party's act of violence does not create the direct causal link that is

25  required to causation.  Although there is no equally analogous Ninth Circuit decision, the

26  reasoning employed by the First and Eighth Circuits is consistent with Ninth Circuit case law on

27  the issue of indirect causation. See *Huffman v. County of Los Angeles*, 147 F.3d 1054 (9th Cir.

28  1998); *Van Ort v. Estate of Stanewich, supra*, 92 F.3d at 837.

1    In *Lopez v. McDonald's Corp.*, 193 Cal.App.3d 495 (1987), a fast food restaurant's

2    failure to have a security guard present was not a substantial factor in the deaths of persons killed

3    by a mentally ill gunman in the restaurant. The Court observed that the argument that the use of

4    security at the restaurant would have deterred the murderer and prevented the massacre

5    "constitute[d] a classic example of plaintiffs establishing "abstract negligence...." *Id.* at 515-516.

6        4.   The Use of Excessive Force Was Unforeseeable and/or Extraordinarily Negligent

7        The Hospital's alleged advice to Mrs. Chass was closer in time to Jeremiah's alleged

8    assault on his brother than the officers' failures to act in *Ricketts* or *Rodriguez-Cirilo*, but that

9    does not create a causal link in this case. The alleged advice to wait until morning to bring

10    Jeremiah to the emergency room was not the mechanism of harm here, nor did it foreseeably

11    lead to the actual harm suffered.

12        Unsurprisingly, there is no allegation in the Third Party Complaint that the Sheriff's

13    Department's propensity to use excessive force against mentally ill persons was so well-known

14    that the Hospital should have expected excessive force would be used. Numerous cases compel

15    the conclusion that the alleged use of excessive force by the deputies was a superseding cause

16    that cuts off the Hospital's liability.

17        A review of the allegations of the complaint is an appropriate starting place. The First

18    Claim asserts that the deputies violated Jeremiah's Fourth Amendment rights by using excessive

19    force. Plaintiffs allege that Deputies Misita and Ryan "acted in reckless and callous disregard for

20    the constitutional rights of decedent, and with willful oppression and malice." (Complaint, ¶ 35.)

21    Plaintiffs seek both general and punitive damages against the officers on this claim.

22        Plaintiffs' Second Claim is for violation of Jeremiah's family's substantive due process

23    right to familial association. In order to state such a claim, plaintiffs must prove that the officers

24    acted with an "intent to harm" unrelated to any legitimate law enforcement purpose. *County of*

25    *Sacrament v. Lewis,* 523 U.S. 833, 854 (1998). "[O]nly the most egregious official conduct can

26    be said to be arbitrary in a constitutional sense." *Id.* at p. 846 (internal quotations and citation

27    omitted). "Liability for negligently inflicted harm is categorically beneath the threshold of

28    constitutional due process." *Id. at* 849, (1998) (citations omitted). See also see also *Wood v.*

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

11

1    *Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (even gross negligence is insufficient to

2    establish a constitutional violation).

3         The Third Claim, asserted against the County, alleges the County was deliberately

4    indifferent to the civil rights of the plaintiffs due to prior knowledge of the deputies' unjustified

5    use of deadly force against the mentally ill, the failure to properly train, supervise and discipline

6    the deputies despite that knowledge and after-the-fact ratification of the deputies' actions.  These

7    practices constituted a de facto policy or custom that was the moving force behind the alleged

8    constitutional violations.  (Complaint, ¶¶ 25 and 42.)

9         The first two claims allege conduct that could constitute criminal acts by the deputies.

10   The use of excessive force may constitute a battery or an attempted assault.  An assault "is an

11   unlawful attempt, coupled with a present ability, to commit a violent injury on the person of

12   another.  Calif. Penal Code § 240.  "A battery is any willful and unlawful use of force or violence

13   upon the person of another."  Calif. Penal Code § 242.  And under the substantive due process

14   standard discussed above, killing someone unrelated to any legitimate law enforcement purpose

15   is essentially an allegation of manslaughter.  Calif. Penal Code § 192(a): "Manslaughter is the

16   unlawful killing of a human being without malice."  The Third Claim alleges the County's

17   <u>deliberate</u> indifference to plaintiffs' constitutional rights was a moving force behind the violation

18   of those rights.  The only two claims - the Fourth Claim for Wrongful Death and the Fifth Claim

19   for Negligent Infliction of Emotional Distress - are theoretically based on alleged negligent

20   conduct by the deputies, and even those claims are necessarily based on the shooting of

21   Jeremiah, clearly an intentional act, whether wrongful or not.

22        California cases require a heightened degree of foreseeability where the intervening force

23   is not merely negligent.  See *Wiener, supra,* at pp. 1149–1150.  See also *Juarez v. Boy Scouts of*

24   *America, Inc.* (2000) 81 Cal.App.4th 377, 394.  The cases finding criminal acts of third parties to

25   be superseding acts abound.  In addition to those discussed above, in *Gonzalez v. Derrington,* 56

26   Cal.2d 130 (1961), the California Supreme Court held that a defendant who negligently sold

27   gasoline in an open case to a person who used it to set fire to an occupied bar was not liable as

28   the act of the arsonist was superseding.  *Id.* at 133.

1    Even negligent intervening acts, however, break the chain of causation where the

2  negligence is unforeseeable, or highly extraordinary even if foreseeable. (Rest.2d, Torts, § 442.)

3  In *Schrimsher v. Bryson* (1976) 58 Cal.App.3d 660 (1976), a highway patrol officer,

4  investigating an accident in which one of the drivers was under the influence of alcohol, ordered

5  the drunk driver to pull his car off the road. Another car, driven by another drunk driver, veered

6  off the road and struck the first drunk driver's car, propelling it into the officer. The officer sued

7  the first drunk driver. The Court held "[i]t would be an unwarranted extension of liability to hold

8  that when a traffic officer, who is issuing a citation, investigating an accident or performing other

9  of his duties, is injured as a result of the <u>negligence</u> or criminal conduct of one person, liability

10  may be imposed on the original traffic violator whose conduct brought the officer to the scene."

11  *Id.* at 665. [Emphasis supplied.] The Court further stated that the action of the second drunk

12  driver "could not reasonably have been anticipated by defendant at the time of his initial

13  negligence and as a matter of law the chain of causation was broken." *Id.* at 664.

14    In *Martinez v. Vintage Petroleum*, 68 Cal.App.4th 695 (1998), plaintiff's coworkers,

15  employees of independent contractor, cut into a pressurized gas line, causing the pipe to burst

16  and injuring the plaintiff. The Court held the negligence of the coworkers was a superseding

17  cause, relieving the employer of liability, because it was both extraordinarily negligent and

18  dangerous. *Id.* at 701.

19    In *Premo v. Grigg*, 237 Cal.App.2d 192, 194 (1965), a dishwasher and janitor at a pizza

20  parlor brought his four-year-old daughter to work while he cleaned the premises. The employer

21  knew of this practice and tacitly allowed it. Preparatory to mopping the floor, the father filled a

22  bucket with hot water and carried it into the dining room where he left it unattended. A few

23  minutes later, he heard his daughter scream and found her immersed in the bucket. The child

24  died from the burns received from the scalding water. The Court held the negligent acts of the

25  father constituted a superseding cause as a matter of law, relieving the employer from liability.

26  *Id.* at 199.

27    A lumber company was insulated from liability in *Stultz v. Benson Lumber Co.*, 6 Cal.2d

28  688 (1936) even though the company supplied wood too defective to be used for scaffolding

1  with the knowledge it would be so used.  The employer's decision to use the wood, the defects of

2  which were obvious, was an intervening cause which broke the chain of causation.  *Id.* at 695.

3        5.      The Duty Imposed on the Hospital Was not Designed to Protect Against the
               Harm Suffered

4

5        The Restatement instructs that whether the result of the actor's conduct is highly

6  extraordinary and, thus, superseding, involves "determining whether the duty imposed on the

7  actor was designed to protect the one harmed from the risk of harm from the hazard in question.

8  However, courts frequently treat such problems as problems of causation."  Rest.2d, Torts,

9  §4352(2), com. c.  [Internal citations omitted.]  Looking at this case from the standpoint of the

10  duty imposed on the hospital rather than causation, it is clear that the harm caused to Jeremiah

11  and his family by the deputies was not one the hospital's duty was designed to protect against.

12  The basis of the alleged duty to treat Jeremiah is asserted to be California Health & Safety Code

13  § 1317(a), which provides:

14

15        Emergency services and care shall be provided to any person requesting the
          services or care, or for whom services or care is requested, for any condition in
16        which the person is in danger of loss of life, or serious injury or illness, at any
          health facility licensed under this chapter that maintains and operates an
17        emergency department to provide emergency services to the public when the
          health facility has appropriate facilities and qualified personnel available to
18        provide the services or care.

19

20        The Legislature enacted § 1317, to accomplish three purposes.  One of the original

21  purposes of the statute, formerly § 1426, was to address the problem of patients being turned

22  away from emergency rooms because they had no health insurance.  Subdivision (d) of § 1317

23  provides in pertinent part: "Emergency services and care shall be rendered without first

24  questioning the patient or any other person as to his or her ability to pay therefor."  A second

25  purpose was to provide immunity to emergency health care providers in certain circumstances.

26  See, e.g., *Lowry v. Henry Mayo Newhall Mem'l Hosp.*, 185 Cal.App.3d 188 (1986); Health &

27  Safety Code § 1317(c), (f) and (g).

28        Finally, the Legislature also found the cost of providing emergency medical services was

1  greater than the cost of providing other medical services. "If allowed to continue, these higher

2  costs and lower reimbursements could force many physicians to reduce the quality and

3  availability of emergency medical services, to the detriment of Californians." Stats 1987, ch.

4  1240. Accordingly, "by enacting this legislation, the Legislature is providing a means of partial

5  funding for these vital services. Further, it is the intent of the Legislature that the source of

6  funding of emergency medical services be related to the incident of emergencies requiring

7  immediate medical care. Thus, this act will levy an additional penalty assessment on traffic and

8  other fines. In this way, the costs of emergency medical services shall be borne to a degree by

9  those who have a relationship to creating the emergencies." Stats 1987, ch. 1240.

10      There is no allegation that the intake coordinator advised Mrs. Chass that Jeremiah

11  probably would not be seen in the emergency room due to a lack of insurance. To the contrary,

12  the Third Party Complaint alleges that the coordinator advised Mrs. Chass to bring Jeremiah in

13  the following morning. The duty imposed on hospitals to provide emergency services regardless

14  of insurance coverage was not designed to protect against encountering peace officers who

15  would use excessive force. Thus, this analysis also leads to the conclusion that the harm

16  encountered was extraordinary.

17  **B.      Defendants Do Not Allege any Basis for a Duty to Jeremiah's Family**

18      Section 1317 provides only that hospitals that offer emergency medical care must provide

19  such care to persons requesting it or for whom such care is requested. It does not establish any

20  duty to the relatives of such persons. The Second, Fourth and Fifth claims are brought on behalf

21  of Jeremiah's parents and brother. On its face, § 1317 does not reach such persons and there is

22  no decisional law extending the duty encapsulated in § 1317 to such persons.

23      Common law duty precepts do not support liability on the part of the Hospital to the

24  Chass family either, even if pled. In *Burgess v. Superior Court,* 2 Cal.4th 1064 (1992), the

25  California Supreme Court, analyzing the "direct victim" branch of negligent infliction of

26  emotional distress held that a physician-patient relationship between the plaintiff and the health

27  care provider was critical to "direct victim" liability in the medical context. *Id.* at 1078, fn.8.

28  Earlier, in *Schwarz v. Regents of University of California,* 226 Cal.App.3d 149 (1990), the Court

1    of Appeal denied recovery for emotional distress to a father who alleged he was the direct victim

2    of a psychotherapist whom he had retained to treat his son and who helped the mother take the

3    son out of the country. Because the Court found only the son was the therapist's patient, even

4    though the plaintiff father had participated in counseling sessions, it held the father could not

5    recover for negligent infliction of emotional distress. *Id.* at 161 163. There is no allegation that

6    Jeremiah's family members were patients of the Hospital at all, let alone for any treatment at

7    issue in this lawsuit. Therefore, the Hospital did not owe them a legal duty. In addition, the

8    contemporaneous awareness of an injury producing event is absent here and would bar a

9    "bystander" negligent infliction claim. *Thing v. La Chusa* (1989) 48 Cal.3d 644, 667-668 -

10    bystander must be "present at the scene of the injury producing event at the time it occurs and

11    then aware that it is causing injury to the victim." At the time Mrs. Chass spoke to the intake

12    coordinator, she could not have been "then aware" that the coordinator's alleged advice was

13    producing injury since Jeremiah suffered no physical injury until he came into contact with

14    sheriff's deputies.

15      Also instructive is *Meighan v. Shore*, 34 Cal.App.4th 1025 (1995), wherein a wife,

16    believing her husband to be having a heart attack, implored the hospital to call a cardiologist who

17    did not show up for several hours after being called. As time passed, the wife, who had been

18    trained as a nurse, and who knew that certain medication was only effective during the early

19    hours of a heart attack, became hysterical and demanded that the nurses get a cardiologist in

20    immediately to examine her husband. When a cardiologist finally arrived, he wrongly

21    determined that husband was not having heart attack and, accordingly, did not administer

22    medication that might have prevented damage to the heart. The court found the wife had no

23    viable bystander cause of action because the facts did not "satisfy the witness and awareness

24    requirement of *Thing*." *Id.* at 1045.

25      Medical professionals normally owe no duty of care to third parties who might suffer

26    reasonably foreseeable harm as a result of medical negligence. See *Calderon v. Glick* (2005)

27    131 Cal.App.4th 224, 233 [affirming order granting summary judgment in favor of

28    psychotherapist in action for wrongful death and professional negligence where

1   psychotherapist's patient shot five members of former girlfriend's family].  Because the Hospital

2   here is neither a concurrent nor a joint tortfeasor with respect to plaintiffs' injuries, defendants

3   cannot assert a claim for equitable indemnity for the Second, Fourth, or Fifth claims.  *Munoz v.*

4   *Davis*, 141 Cal. App. 3d 420, 425 (1983) ["Whatever confusion may have existed in the case law

5   of equitable indemnity [citation], one point stands clear: there can be no indemnity without

6   liability. In other words, unless the prospective indemnitor and indemnitee are jointly and

7   severally liable to the plaintiff there is no basis for indemnity."]; *Seamen's Bank v. Superior*

8   *Court,* 190 Cal. App. 3d 1485, 1491 (1987) [applying *Munoz v. Davis, supra*, 141 Cal. App. 3d

9   420, to reject claim for equitable indemnity].

10  **C.    An Intentional Tortfeasor May Not Seek Equitable Indemnity from a Negligent**
11  **Tortfeasor**

12      "The right of what may be termed equitable indemnity [citation] enures to a person who,

13  <u>without active fault on his part</u>, has been compelled by reason of some legal obligation to pay

14  damages occasioned by the initial and active negligence of another. This involves the equitable

15  considerations of primary and secondary liability, or, to put it differently, concepts of active and

16  passive conduct." *S.F. Examiner Division v. Sweat,* 248 Cal.App.2d 493, 497 (1967).  [Emphasis

17  added.]

18      A tortfeasor guilty of an intentional tort may not seek indemnification for any amount of

19  the judgment from a negligent tortfeasor. *Leko v. Cornerstone Bldg. Inspection Service*, 86

20  Cal.App.4th 1109, 1120  (2001) [cross-complaint for equitable indemnity proper only insofar as

21  it seeks relief from liability for negligence or other nonintentional torts]; *Weidenfeller v. Star &*

22  *Garter*, 1 Cal.App.4th 1, 6-7 (1991) ["intentional actor cannot rely on someone else's negligence

23  to shift responsibility for his or her own conduct"]; see *PPG Industries, Inc. v. Transamerica Ins.*

24  *Co.,* 20 Cal.4th 310, 319 (1999) [recognizing strong public policy against permitting liability for

25  intentional wrongdoing to be offset or reduced by the negligence of another]; see also Calif.

26  Code Civ. Proc., § 875(d) ["There shall be no right of contribution in favor of any tortfeasor who

27  has intentionally injured the injured person."].

28      As previously noted only two claims ostensibly involve negligence here.  Defendants

1   cannot seek to shift liability for their conduct on the civil rights claims - which conduct would be

2   analogous to several crimes if true - to shift responsibility onto the Hospital, which is only

3   alleged to be negligent. As to the two state law claims, defendants are not entitled to indemnity

4   because they have not alleged any legally cognizable duty on the part of the Hospital to the

5   Chass family, as argued above.

6   **D.    The Hospital Cannot Be the Actual Cause of the Alleged *Monell* Violations**

7       Plaintiff's Third Claim is based on *Monell v. Department of Social Services*, 436 U.S.

8   658, 691 (1978), which held that a local government entity may not be held responsible for the

9   acts of its employees under a respondeat superior theory of liability. Rather, to state a claim for

10   municipal or county liability, a plaintiff must allege that a policy or custom of the local

11   government entity was a moving force behind the alleged constitutional deprivation. *City of*

12   *Canton, Ohio, v. Harris*, 489 U.S. 378, 385 (1989).

13       The *Monell* claim here is based on allegations that the Sheriff's Department failed to

14   train, supervise and discipline the two deputies and other deputies despite prior knowledge of

15   their use of excessive force against mentally ill individuals. Alternatively or additionally, the

16   *Monell* claim is based on ratification of the conduct after the event. Whatever the legal impact of

17   the Hospital's alleged conduct on the night of March 11, it cannot have been the actual cause of

18   the Sheriff's Department's failure to train, supervise or discipline its officers prior to their

19   encounter with Jeremiah on March 12. Nor can the Hospital's conduct have been the actual

20   cause of the Department's alleged subsequent ratification of the deputies' actions.

21       Actual cause exists where a defendant's conduct was "'a substantial factor in bringing

22   about the injury.'" *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991). Actual cause is often

23   declared to be an issue of fact; however, it may be decided as a question of law if, under

24   undisputed facts, reasonable minds would reach but one conclusion. *Kurinij v. Hanna &*

25   *Morton*, 55 Cal.App.4th 853, 864 (1997); *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287

26   F.Supp.2d 1118, 1200 (C.D.Cal. 2003). Reasonable minds could not differ here. The Hospital is

27   not alleged to have played any role whatsoever in the prior training, supervision, or discipline of

28   deputies regarding their use of force against mentally ill individuals. Nor is the Hospital alleged

1    to have played any role in the Sheriff's Department's subsequent ratification of the deputies'

2    actions during their encounter with Jeremiah.  Actual cause does not exist for the Third Claim as

3    a matter of law.

4    **V.     CONCLUSION**

5        For all of the foregoing reasons, Santa Rosa Memorial Hospital respectfully requests that

6    the Court dismiss defendant's Third Party Complaint without leave to amend and for such other

7    and further relief as the Court deems appropriate.

8

9    Dated:  August 28, 2008               TATE & ASSOCIATES

10

11                  By_____

12                     Lauren E. Tate,
                        Attorneys for Defendant SANTA ROSA
                        MEMORIAL HOSPITAL

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2      I, the undersigned, hereby declare that I am over the age of eighteen years and not a party
to the within action. I am readily familiar with this firm's business practice for collection and
3   processing of correspondence for mailing with the U.S. Postal Service. My business address is
1321 Eighth Street, Suite 4, Berkeley, California 94710. On the date indicated below, I served
4   the following document(s):

5

**DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S
MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]**

6

7

upon the following at the address(es) stated below:

8

Andrew C. Schwartz, Esq.
9   Casper, Meadows, Schwartz & Cook
2121 North California Blvd., Suite 1020
10  Walnut Creek, CA 94596

11  Patrick Emery, Esq.
Abbey, Weitzenberg, Warren & Emery
12  100 Stony Point Road, Suite 200
Santa Rosa, CA 95402

13
Stephen Corson Mitchell, Esq.
14  Leo R. Bartolotta, Esq.
Matthew Kevin Good
15  Geary Shea O'Donnell & Grattan PC
37 Old Courthouse Square, 4th Floor
16  P O Box 429
Santa Rosa, CA 95404

17
X  **BY MAIL** by depositing true and correct copies in sealed envelopes in the United States
18     Mail in accordance with the usual mailing practice of this firm.

19  __ **BY PERSONAL SERVICE** in accordance with ordinary business practices during ordinary
       business hours.
20

__ **BY FAX** at number listed. Said copies were placed for transmission by this firm's facsimile
21     machine transmitting from (510) 525-5130, Berkeley, California. The record of the
       transmission was properly issued by the transmitting fax machine.
22

23  __ **BY UPS** overnight delivery.

24      I declare under penalty of perjury under the laws of the State of California that the
foregoing is true and correct, and that this declaration was executed on August 28, 2008, at
25  Berkeley, California.

26

27                                                  Melanie DeGiovanni

28