1  LAUREN E. TATE, SBN 124483
   TATE & ASSOCIATES
2  1321 Eighth Street, Suite 4
   Berkeley, CA 94710
3  Tel: (510) 525-5100
   Fax: (510) 525-5130
4
   Attorneys for Third Party Defendant
5  SANTA ROSA MEMORIAL HOSPITAL

6

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11  ESTATE OF JEREMIAH CHASS, MARK          CASE NO: CV 08 0111 MMC
    CHASS, YVETTE CHASS, and I.C., a minor,
12  by the through his Guardian Ad Litem,    **DEFENDANT SANTA ROSA**
    YVETTE CHASS,                            **MEMORIAL HOSPITAL'S AMENDED**
13                                           **MOTION TO DISMISS THIRD PARTY**
            Plaintiffs,                      **COMPLAINT**
14                                           **[Fed. R. Civ. Proc. 12(b)(6)]**
        vs.
15
                                            **Date: October 10, 2008**
16  COUNTY OF SONOMA, BILL COGBILL,         **Time: 9:00 a.m.**
    in his individual capacity and in his official   **Dept: 7, 19th Floor**
17  capacity as Sheriff for the COUNTY OF
    SONOMA, SONOMA COUNTY DEPUTY
18  SHERIFF JOHN MISTA, SONOMA
    COUNTY DEPUTY SHERIFF JIM RYAN,
19  and DOES 1 through 50,                   **Honorable Maxine M. Chesney**

20          Defendants and Third Party Plaintiff's,

21      vs.

22  SANTA ROSA MEMORIAL HOSPITAL,

23          Third Party Defendant.

24

25

26

27

28
    ─────────────────────────────────────────────────────────
    DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT
    [Fed. R. Civ. Proc. 12(b)(6)]

# TABLE OF CONTENTS

NOTICE OF DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)] ............................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)] .................. 1

I.      Issues Presented and Relief Sought ............................................ 1

II.     Allegations of the Complaint ..................................................... 2

III.    Allegations of the Third Party Complaint ..................................... 2

IV.     Argument .............................................................................. 4

      A.      The Use of Excessive Force Was a Superseding Cause ......................... 4

            1.      Whether a Duty Exists Is a Question of Law ........................... 4

            2.      Considerations in Determining Whether an Intervening Force Is Superseding ........................................................... 5

            3.      The General Risk that Jeremiah Might Encounter the Police Is Highly Speculative ................................................... 7

            4.      The Use of Excessive Force Was Unforeseeable and/or Extraordinarily Negligent ............................................... 10

            5.      The Duty Imposed on the Hospital Was not Designed to Protect Against the Harm Suffered ..................................... 13

      B.      Defendants Do Not Allege any Basis for a Duty to Jeremiah's Family ....... 14

      C.      An Intentional Tortfeasor May Not Seek Equitable Indemnity from a Negligent Tortfeasor ............................................................. 16

      D.      The Hospital Cannot Be the Actual Cause of the Alleged *Monell* Violations ....................................................................... 17

V.      CONCLUSION ....................................................................... 18

<table>
<tr><td>1</td><td colspan="2" align="center">TABLE OF AUTHORITIES</td></tr>
</table>

TABLE OF AUTHORITIES

*Ballard v. Uribe,*
    41 Cal. 3d 564, 572, n. 6 (1986) ................................................ 5

*Blue Shield of Virginia v. McCready,*
    457 U.S. 465, 478 n.13 (1982) ................................................ 5

*Brewer v. Teano,*
    40 Cal.App.4th 1024, 1035 (1995) ................................................ 5, 6, 7

*Burgess v. Superior Court,*
    2 Cal.4th 1064 (1992) ................................................ 14

*Calderon v. Glick,*
    131 Cal.App.4th 224, 233 (2005) ................................................ 16

*Carson Harbor Vill., Ltd. v. Unocal Corp.,*
    287 F.Supp.2d 1118, 1200 (C.D.Cal. 2003) ................................................ 18

*City of Canton, Ohio, v. Harris,*
    489 U.S. 378, 385 (1989) ................................................ 17

*County of Sacramento v. Lewis,*
    523 U.S. 833, 854 (1998) ................................................ 10, 11

*Federico v. Superior Court,*
    59 Cal.App.4th 1207 (1997) ................................................ 7

*Gonzalez v. Derrington,*
    56 Cal.2d 130 (1961) ................................................ 12

*Hardison v. Bushnell,*
    18 Cal.App.4th 22, 26 (1993) ................................................ 5

*Huffman v. County of Los Angeles,*
    147 F.3d 1054 (9th Cir. 1998) ................................................ 10

*Juarez v. Boy Scouts of America, Inc.,*
    81 Cal.App.4th 377, 401 (2000) ................................................ 5, 11

*Kurinij v. Hanna & Morton,*
    55 Cal.App.4th 853, 864 (1997) ................................................ 17, 18

*Leko v. Cornerstone Bldg. Inspection Service,*
    86 Cal.App.4th 1109, 1120 (2001) ................................................ 16

*Lopez v. McDonald's Corp.,*
    193 Cal.App.3d 495 (1987) ................................................ 10

*Lowry v. Henry Mayo Newhall Mem'l Hosp.,*
    185 Cal.App.3d 188 (1986) ................................................ 14

**DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT**
[Fed. R. Civ. Proc. 12(b)(6)]

iii

*Ann M. v. Pacific Plaza Shopping Center,*
    6 Cal.4th 666, 678, 863 P.2d 207 (1993) ........................................... 5

*Martinez v. Vintage Petroleum, Inc.,*
    68 Cal.App.4th 695 (1998) ........................................................ 5, 12

*Meighan v. Shore,*
    34 Cal.App.4th 1025 (1995) ........................................................ 15

*Mitchell v. Gonzales,*
    54 Cal. 3d 1041, 1049 (1991) ...................................................... 17

*Monell v. Department of Social Services,*
    436 U.S. 658, 691 (1978) ........................................................... 17

*Munoz v. Davis,*
    141 Cal. App. 3d 420, 425 (1983) ................................................. 16

*PPG Industries, Inc. v. Transamerica Ins. Co.,*
    20 Cal.4th 310, 319 (1999) ........................................................ 16

*Premo v. Grigg,*
    237 Cal.App.2d 192, 197 (1965) ................................................ 7, 12

*Ricketts v. City of Columbia Missouri*
    36 F.3d 775 (8th Cir. 1994) ...................................................... 9, 10

*Rodriguez-Cirilo v. Garcia,*
    115 F.3d 50 (1st Cir. 1997) ....................................................... 9, 10

*Saelzler v. Advanced Group 400,*
    25 Cal.4th 763, 775-776 (2001) .................................................... 8

*Seamen's Bank v. Superior Court,*
    190 Cal. App. 3d 1485, 1491 (1987) ............................................... 16

*Schrimsher v. Bryson,*
    58 Cal.App.3d 660 (1976) .......................................................... 12

*Schwarz v. Regents of University of California,*
    226 Cal.App.3d 149 (1990) ......................................................... 15

*S.F. Examiner Division v. Sweat,*
    248 Cal.App.2d 493, 497 (1967) ................................................... 16

*Stewart v. Cox,*
    55 Cal.2d 857, 864 (1961) .......................................................... 4

*Stultz v. Benson Lumber Co.,*
    6 Cal.2d 688 (1936) ................................................................ 13

*Sundance Land Land Corp. v. Community First Federal Sav. & Loan Assoc.,*
    840 F.2d 653, 663 (9th Cir. 1988) .................................................. 5

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

*Thing v. La Chusa,*
   48 Cal.3d 644, 667-668 (1989) ........................................................ 15

*Van Ort v. Estate of Stanewich,*
   92 F.3d 831, 837 (9th Cir. 1996) ................................................... 4, 10

*Weidenfeller v. Star & Garter,*
   1 Cal.App.4th 1, 6-7 (1991) .......................................................... 16

*Wiener v. Southcoast Childcare Centers, Inc.,*
   32 Cal.4th 1138, 1148, 1150 (2004) ............................................. 7, 11

*Wood v. Housewright,*
   900 F.2d 1332, 1334 (9th Cir. 1990) ............................................. 11

<u>STATUTES</u>

42 U.S.C. § 1983............................................................................. 2

California Code of Civil Procedure, § 875(d) ....................................... 17

California Health & Safety Code § 1317 ................................... 3, 4, 13, 14

California Health & Safety Code § 1317(a) .......................................... 13

California Health & Safety Code § 1317(d) .......................................... 13

California Health & Safety Code § 1426 .............................................. 13

California Penal Code § 240 ............................................................. 11

Calif. Penal Code § 242 ................................................................. 11

Calif. Penal Code § 192(a) .............................................................. 11

Federal Rule of Civil Procedure 12(b)(6) ............................................. 1

Restatement 2nd, Torts, § 440 ........................................................... 4

Restatement 2nd, Torts, § 442 .......................................................... 12

Restatement 2nd, Torts, § 453 ........................................................... 5

Restatement 2nd, Torts, §4352(2), com. c. ........................................... 13

6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 975, p. 366 ................. 4

1  **NOTICE OF DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED**
**MOTION TO DISMISS THIRD PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)]**

2

3  **PLEASE TAKE NOTICE** that on October 10, 2008 at 9:00 a.m. in Courtroom 7 of the

4  above-captioned Court, third party defendant Santa Rosa Memorial Hospital will and hereby

5  does move this Court to dismiss the third party complaint filed by defendants pursuant to Federal

6  Rule of Civil Procedure 12(b)(6). This motion is made on the grounds that the third party

7  complaint fails to state facts sufficient to constitute any cause of action against third party

8  defendant and is based on this notice, the accompanying points and authorities, the complete files

9  and records in this case and on such other evidence and argument as may be presented at the

10  hearing on this motion.

11  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT**
**SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD**

12  **PARTY COMPLAINT [Fed. R. Civ. Proc. 12(b)(6)]**

13  **I.    Issues Presented and Relief Sought**

14  Pursuant to Fed. R. Civ. Proc. 12(b)(6), third party defendant Santa Rosa Memorial

15  Hospital asks the court to dismiss the Third Party Complaint without leave to amend for failure

16  to state facts sufficient to constitute any cause of action.

17  Sonoma County Sheriff's Department allegedly intentionally shot and killed a mentally

18  ill teenager, Jeremiah Chass, in front of his family for reasons unrelated to any legitimate law

19  enforcement purpose. They seek equitable indemnity from Santa Rosa Memorial Hospital, based

20  on allegations that the Hospital should have treated Jeremiah the night before and that had they

21  done so, Jeremiah would not have threatened to kill his brother the next morning and the

22  deputies would not have been summoned.

23  There are a multitude of reasons why defendants are not entitled to equitable indemnity

24  from the Hospital in this civil rights shooting death case. Defendants found no equitable

25  indemnity case involving similar circumstances, no doubt because what defendants seek to do

26  goes far beyond the boundaries of the law.

27  First, all claims are barred by the fact that the use of excessive force by Sheriff's deputies

28  was a superseding cause that relieves the Hospital of liability. There are a number of different

1   analytical paths that compel this conclusion, both from a causation standpoint and scope of duty

2   standpoint. Second, defendants do not allege facts that would show the Hospital had any duty to

3   Jeremiah's family, which bars indemnity for the claims asserted only by the family (second

4   through fifth claims). Third, an intentional tortfeasor cannot obtain indemnity from a negligent

5   tortfeasor, and the three civil right claims (first, second and third) allege intentional or

6   deliberately indifferent action. Finally, the Hospital, which is not alleged to have any

7   involvement in running the Sheriff's Department, cannot have been the actual cause of the

8   alleged *Monell* violations, which is grounded on Sheriff's Department custom, practice and

9   policies.

10   **II.    Allegations of the Complaint**

11        Plaintiffs' complaint essentially alleges that Sonoma County deputies executed a

12   mentally ill teenager, Jeremiah Chass, in front of his family while the teenager was flat on his

13   back in a van. (Complaint, ¶ 21.) Plaintiffs allege that Jeremiah's father, Mark Chass, called

14   the Sebastopol Fire Department on March 12, 2007 for EMT medical assistance to transport

15   Jeremiah to the hospital, but the call was routed to the Sonoma County Sheriff's Department,

16   which dispatched Deputies Misita and Ryan to the Chass home. (*Id.*, ¶ 12.) Plaintiffs contend

17   that, although Jeremiah had holed up in the family's minivan with a wood-working tool and had

18   been "making irrational statements," his parents had physically restrained him before the

19   deputies arrived. (*Id.*, ¶ 16.) On arrival, the deputies pepper sprayed Jeremiah, struck him with a

20   baton, put him in a head lock and then discharged their weapons at him, killing him. (*Id.*, ¶¶ 19

21   and 21.)

22        The complaint sets out two civil rights claims (42 U.S.C. § 1983) against the deputies

23   alleging the use of excessive force and one civil rights claim against the County, alleging the

24   failure to train deputies to handle encounters with mentally ill persons and/or ratification of the

25   misconduct of the deputies. (First, Second and Third Claims.) Two state law claims are asserted

26   for wrongful death and negligent infliction of emotional distress. (Fourth and Fifth Claims.)

27   **III.    Allegations of the Third Party complaint**

28        Sonoma County defendants' third party complaint alleges Jeremiah had assaulted and

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

1    threatened to kill his brother with a knife on the morning of March 12, 2007. (Third Party

2    Complaint, ¶ 12.) When Sonoma County deputies arrived, they found Jeremiah in a "violent,

3    delusional, and homicidal state, threatening to kill his brother, and armed with a knife." (*Ibid.*)

4    They contend they justifiably used deadly force against Jeremiah "in response to the threat of

5    great bodily harm or death to themselves and others." (*Ibid.*)

6        Defendants claim the right to equitable indemnity against third party defendant Santa

7    Rosa Memorial Hospital ("Hospital"). They allege that the evening before the shooting

8    decedent's mother, Yvette Chass, called the Hospital and, speaking to an intake coordinator for

9    the acute psychiatric unit, reported that Jeremiah said he and his mother would die that night at

10    1:00 a.m. (Third Party Complaint, ¶¶ 3-4.) Mrs. Chass asked the intake coordinator to speak

11    with Dr. Prokopis, "a family friend and psychologist," regarding Jeremiah, and the intake

12    coordinator did so. (*Id.*, ¶¶ 4-5.) Dr. Prokopis allegedly told the intake coordinator he believed

13    Jeremiah needed "emergency care and an immediate psychological assessment." (*Id.*, ¶ 5.)

14        Defendants allege the intake coordinator told both Mrs. Chass and Dr. Prokopis that they

15    should wait until the morning to have Jeremiah evaluated and that if they brought him into the

16    emergency room that night, he would likely not be seen. (*Id.*, ¶ 6.) Allegedly as a result of this

17    conversation, Mrs. Chass did not take Jeremiah to the emergency room that night. (*Id.*, ¶ 7.) It is

18    not alleged she called 911, contacted the fire or sheriff's department or sought other assistance

19    for Jeremiah until the following morning.

20        Based on these allegations defendants assert the Hospital violated a duty to provide

21    emergency medical care for Jeremiah pursuant to California Health & Safety Code § 1317. They

22    contend the violation of this alleged duty, as well as the alleged failure to train the intake

23    coordinator properly, constituted medical malpractice. (*Id.*, ¶¶ 9-11, 15-16.) They assert that if

24    Jeremiah had been taken to the emergency room, he "would have received treatment and/or

25    services that would have prevented his further mental decline." (*Id.*, ¶ 13.) Consequently, he

26    "would not have assaulted his brother, or threatened to kill his brother on the morning of March

27    12, 2007." (*Id.*, ¶ 13.) Defendants maintain that Jeremiah's violent behavior on March 12 was

28    foreseeable as was the use of force against him by sheriff's deputies. (*Ibid.*)

---

**DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT**
[Fed. R. Civ. Proc. 12(b)(6)]

IV.  **Argument**

A.  **The Use of Excessive Force Was a Superseding Cause**

Leaving aside for the moment whether Health & Safety Code § 1317 even applies in this case, the alleged use of excessive force by the sheriff's deputies is a superseding cause that relieves the Hospital from liability even if the Hospital's alleged negligence was a substantial factor in causing the injuries alleged by plaintiffs.

In § 1983 actions, the Ninth Circuit looks to "[t]raditional tort law" to define "intervening causes that break the chain of proximate causation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). California applies the rules set out in the Restatement Second of Torts regarding superseding cause. *Stewart v. Cox*, 55 Cal.2d 857, 864 (1961). "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement 2nd, Torts, § 440. A superseding cause relieves the actor from liability whether or not that person's negligence was a substantial factor in bringing about the harm. *Id.*, § 440, com. b.

Witkin extracts the following rule from the principles set out in the Restatement: "Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable." 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 975, p. 366.

1.    Whether a Duty Exists Is a Question of Law

Whether an intervening act is a superseding cause as a matter of policy is a question of law for the Court to decide. "[A] court's task--in determining 'duty'--is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be

1    imposed on the negligent party." *Ballard v. Uribe,* 41 Cal. 3d 564, 572, n. 6 (1986). "It is the

2    exclusive function of the court to declare the existence or non-existence of rules which restrict

3    the actor's responsibility short of making him liable for harm which his negligent conduct is a

4    substantial factor in bringing about, and to determine the circumstances to which such rules are

5    applicable." Rest.2nd, Torts, § 453. Both duty as well as foreseeability, as a factor in finding

6    duty, are questions of law. *Juarez v. Boy Scouts of America, Inc.,* 81 Cal.App.4th 377, 401

7    (2000) [duty]; *Ann M. v. Pacific Plaza Shopping Center,* 6 Cal.4th 666, 678, 863 P.2d 207

8    (1993) [foreseeability]. "[T]he existence and extent of a defendant's liability is a question of law

9    and social policy." *Brewer v. Teano,* 40 Cal.App.4th 1024, 1035 (1995).

10        The outer bounds of legal causation are for the Court to decide because the existence of

11    legal cause "essentially depends upon whether the policy of the law will extend the responsibility

12    for the conduct to the consequences which have in fact occurred." *Sundance Land Land Corp. v.*

13    *Community First Federal Sav. & Loan Assoc.,* 840 F.2d 653, 663 (9th Cir. 1988) (internal

14    quotations omitted). See also *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478 n.13

15    (1982). Where an intervening act is not reasonably foreseeable, the defendant's conduct is not

16    deemed the "legal" or proximate cause. *Hardison v. Bushnell,* 18 Cal.App.4th 22, 26 (1993).

17        2.    Considerations in Determining Whether an Intervening Force Is Superseding

18        Section 442 of the Restatement sets out six considerations that are important in

19    determining whether an intervening force is superseding. These are: "(a) the fact that its

20    intervention brings about harm different in kind from that which would otherwise have resulted

21    from the actor's negligence; (b) the fact that its operation or the consequences thereof appear

22    after the event to be extraordinary rather than normal in view of the circumstances existing at the

23    time of its operation; (c) the fact that the intervening force is operating independently of any

24    situation created by the actor's negligence, or, on the other hand, is or is not a normal result of

25    such a situation; (d) the fact that the operation of the intervening force is due to a third person's

26    act or to his failure to act; (e) the fact that the intervening force is due to an act of a third person

27    which is wrongful toward the other and as such subjects the third person to liability to him; (f)

28    the degree of culpability of a wrongful act of a third person which sets the intervening force in

1  motion."

2      The Court in *Martinez v. Vintage Petroleum, Inc.*, 68 Cal.App.4th 695 (1998) distilled

3  these precepts into three tests for determining whether an intervening cause constituted a

4  superseding cause.  Intervening negligence will supersede if any of the three tests applies.  *Id.* at

5  701.  The first test applied the general rule that "superseding cause will be found if both the

6  intervening negligent act and the result are unforeseeable."  *Ibid.*  The second test provided that

7  "foreseeable intervening ordinary negligence will not supersede but such negligence, if 'highly

8  extraordinary,' will supersede."  *Ibid.*  Under the third test "a normal, but negligent, intervening

9  response will not supersede but an extraordinarily negligent response will supersede."  *Ibid.*  In

10  addition, "among other factors important in determining whether an intervening force is

11  superseding are 'the fact that the intervening force is due to a third person's act or failure to act,

12  the wrongful act of a third person, and the degree of culpability of the third person.'"  *Ibid*, citing

13  to *Brewer v. Teano, supra,* 40 Cal.App.4th at 1031, fn. 3, and Rest.2d Torts, § 442, subds. (d),

14  (e), (f).)

15      In *Brewer v. Teano, supra,* 40 Cal.App.4th 1024, the Court based its finding of

16  superseding cause on the first three Restatement considerations.  Therein, a driver, William

17  Teano, negligently, recklessly and repeatedly drove his car into a car driven by plaintiff.  Fearing

18  he would be assaulted by Teano if he pulled over, plaintiff left the scene.  Subsequently, he was

19  arrested and prosecuted for felony hit-and-run.  Plaintiff sued Teano's estate for damages for his

20  prosecution, among other things.  *Id.* at 1027-1028.

21      The trial court sustained a demurrer to this claim, and the appellate court affirmed.  The

22  Court explained:

23      As the Restatement and California cases instruct us, we look at what happened
   with the benefit of hindsight. Even from that perspective, it cannot be said that the
24  intervening force consisting of the prosecution of formal criminal charges against
   plaintiff was "foreseeable" from Teano's conduct, however characterized. The
25  harm from that proceeding was different in kind from that which may be expected
   to result from the kind of conduct alleged in this case. (§ 442, com. (a).) It is an
26  extraordinary rather than a normal result of Teano's act. (*Id.*, com. (b).) The
27  decision of prosecutors to file against plaintiff, and of the magistrate or grand jury
28  to hold him to answer felony charges, operated independently from anything that

Teano did; they cannot be described as a normal result of his negligent driving. (*Id.*, com. (c).) Whether Teano's conduct was negligent or deliberate, it would be "an unwarranted extension of liability" [citation] to hold that Teano's estate is liable for these remote official acts of independent public officers. We conclude that, as a matter of law, plaintiff is not entitled to recover for the damages he suffered as a result of the filing of criminal charges and the subsequent proceedings in the criminal case.

*Brewer v. Teano*, 40 Cal.App.4th at 1037.

Here, too, the alleged use of excessive force by peace officers was not a foreseeable result of the Hospital's alleged advice to Mrs. Chass. "The virtually unanimous agreement that the liability must be limited to cover only those intervening causes which lie within the scope of foreseeable risk, or have at least some reasonable connection with it, is based upon a recognition of the fact that the independent causes which may intervene to change the situation created by the defendant are infinite, and that as a practical matter responsibility simply cannot be carried to such lengths." *Premo v. Grigg* 237 Cal.App.2d 192, 197 (1965).

3. The General Risk that Jeremiah Might Encounter the Police Is Highly Speculative

The California Supreme Court held that when deciding whether an intervening force supersedes, the inquiry is not whether the original actor's negligence created a general risk of harm; rather, the focus is on the kind of harm incurred where the intervening act is negligent and on the mechanism of the harm where the intervening act is criminal. *Wiener v. Southcoast Childcare Centers, Inc.,* 32 Cal.4th 1138, 1148, 1150 (2004). In *Wiener*, a man intentionally drove his car through a chain link fence surrounding a daycare center and into a group of children on the playground there. *Id.* at 1143. Plaintiff sued the daycare center alleging that defendants knew the fence, which was three to four feet from a busy roadway, was inadequate to prevent cars from going through it and, based on prior traffic accidents on the roadway in front of the center, it was foreseeable that a vehicle could leave the road and strike the fence. *Id.* at 1144. The California Supreme Court upheld the trial court's grant of summary judgment. It found that in reversing the trial court's ruling, the Court of Appeal applied the wrong standard because it looked at whether the playground was "generally vulnerable to errant traffic." *Id.* at 1148.

1      This focus was present also in *Federico v. Superior Court*, 59 Cal.App.4th 1207 (1997).

2 Therein, the defendant hired a convicted sex offender who had molested underage boys to

3 supervise to supervise student training at a hairstyling college. *Id.* at 1211.) His job duties

4 involved no regular contact with minors, but he had incidental contact with children who were

5 getting their hair cut or visiting their parents who were students at the school. *Id.* at 1211-1212,

6 1216.) The employee got permission from a student at the school to take her son on a Sunday

7 outing, after which he sodomized the child. *Id.* at 1212.

8      The court held that even if the defendant should have known of the employee's prior

9 convictions and "could have foreseen that [the employee's] duties at the hairstyling school would

10 entail some degree of contact" with underage males, "as a matter of law, hiring [the employee]

11 did not constitute a breach of defendant's limited duty to exercise reasonable care" in selecting

12 employees. *Id.* at 1213. Because the employee's prior convictions "did not involve students or

13 customers of the hairdressing establishments" where he had worked, and because there was no

14 particular connection between the employee's abnormal sexual interest in children and his work,

15 nothing in his history would have indicated to defendant that he "posed a threat of harm to

16 minors he might encounter in the course of his work." *Id.* at 1214-1215. "[A]n employer's

17 liability must be determined in the context of the specific duties the work entails." *Id.* at 1215.

18 While it was "foreseeable [the employee] would come into contact with young males" at work,

19 such "unavoidable encounters" could not support a finding of negligent hiring. *Ibid.* The court

20 also rejected the plaintiff's claim for negligent supervision because the defendant had no reason

21 to know or suspect that the employee had engaged in "inappropriate behavior on the job"

22 involving minors prior to the incident in the case. *Id.* at 1216.

23      The general risk that Jeremiah might encounter the police because of his behavior is not

24 the proper focus here. Nonetheless, the speculative nature of that general risk adds to the

25 remoteness between the Hospital's alleged advice and the intervening force and bears some

26 discussion. *Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 775-776 (2001) [mere possibility

27 of causation is insufficient, because causation cannot be based upon speculation and conjecture].

28 Defendants allege that Jeremiah would not have assaulted his brother had he received treatment

1   and, thus, would not have encountered the police. This is nothing more than an attempt to

2   elevate clairvoyant power into legal duty.

3          Two out-of-circuit cases are instructive and in keeping with Ninth Circuit law on

4   causation. Both cases involved § 1983 actions brought against police agencies for failing to

5   intervene under circumstances roughly analogous to those in the case at bar. Both cases found

6   there was no causation as a matter of law.

7          In *Ricketts v. City of Columbia Missouri*, 36 F.3d 775 (8th Cir. 1994), an estranged

8   husband sexually assaulted his wife and murdered his wife's mother. The wife and decedent's

9   husband brought a § 1983 action against the police, alleging that the police had actual and

10  personal knowledge of numerous violent threats by the husband against the wife but failed to

11  arrest him during any of the many police responses to the husband's violations of a TRO the wife

12  had obtained. *Id.* at 777-778. The Eighth Circuit rejected the argument that this failure to arrest

13  caused plaintiff injuries. In so holding, the court reasoned that "[t]o find that the injuries caused

14  by Sunny's violent acts of sexual assault and murder would have been avoided had Sunny been

15  arrested for the prior harassment would be an excess in pure speculation, even though it would

16  be "logical to assume that continued official tolerance of repeated misconduct facilitates similar

17  unlawful actions in the future." *Id.* at 780. [Internal citations omitted.]

18         In *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50 (1st Cir. 1997), the plaintiffs sued police

19  officers after one of the plaintiffs was stabbed by Francisco, his mentally ill and violent brother.

20  Plaintiffs alleged the police failed to arrest Francisco pursuant to a mandatory temporary

21  detention order, notwithstanding Francisco's threats to stab people and the family's efforts to

22  convince the officers that Francisco was dangerous. *Id.* at 51. To establish causation, the

23  plaintiffs relied upon the declaration of a psychologist stating that had Francisco been detained

24  when police had a duty to detain him, he would have received effective treatment which would

25  have prevented the stabbing. *Id.* at 53. The First Circuit held that the declaration of the

26  psychologist did not constitute competent evidence of causation. *Ibid.*

27         The decisions in *Ricketts* and *Rodriguez-Cirilo* make clear that a mere possibility an actor

28  could have prevented a third party's act of violence does not create the direct causal link that is

1    required to causation. Although there is no equally analogous Ninth Circuit decision, the

2    reasoning employed by the First and Eighth Circuits is consistent with Ninth Circuit case law on

3    the issue of indirect causation. See *Huffman v. County of Los Angeles*, 147 F.3d 1054 (9th Cir.

4    1998); *Van Ort v. Estate of Stanewich, supra*, 92 F.3d at 837.

5        In *Lopez v. McDonald's Corp.*, 193 Cal.App.3d 495 (1987), a fast food restaurant's

6    failure to have a security guard present was not a substantial factor in the deaths of persons killed

7    by a mentally ill gunman in the restaurant. The Court observed that the argument that the use of

8    security at the restaurant would have deterred the murderer and prevented the massacre

9    "constitute[d] a classic example of plaintiffs establishing "abstract negligence...." *Id.* at 515-516.

10       4.    The Use of Excessive Force Was Unforeseeable and/or Extraordinarily Negligent

11       The Hospital's alleged advice to Mrs. Chass was closer in time to Jeremiah's alleged

12   assault on his brother than the officers' failures to act in *Ricketts* or *Rodriguez-Cirilo*, but that

13   does not create a causal link in this case. The alleged advice to wait until morning to bring

14   Jeremiah to the emergency room was not the mechanism of harm here, nor did it foreseeably

15   lead to the actual harm suffered.

16       Unsurprisingly, there is no allegation in the Third Party Complaint that the Sheriff's

17   Department's propensity to use excessive force against mentally ill persons was so well-known

18   that the Hospital should have expected excessive force would be used. Numerous cases compel

19   the conclusion that the alleged use of excessive force by the deputies was a superseding cause

20   that cuts off the Hospital's liability.

21       A review of the allegations of the complaint is an appropriate starting place. The First

22   Claim asserts that the deputies violated Jeremiah's Fourth Amendment rights by using excessive

23   force. Plaintiffs allege that Deputies Misita and Ryan "acted in reckless and callous disregard for

24   the constitutional rights of decedent, and with willful oppression and malice." (Complaint, ¶ 35.)

25   Plaintiffs seek both general and punitive damages against the officers on this claim.

26       Plaintiffs' Second Claim is for violation of Jeremiah's family's substantive due process

27   right to familial association. In order to state such a claim, plaintiffs must prove that the officers

28   acted with an "intent to harm" unrelated to any legitimate law enforcement purpose. *County of*

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

1  *Sacramento v. Lewis,* 523 U.S. 833, 854 (1998).  "[O]nly the most egregious official conduct can

2  be said to be arbitrary in a constitutional sense." *Id.* at p. 846 (internal quotations and citation

3  omitted).  "Liability for negligently inflicted harm is categorically beneath the threshold of

4  constitutional due process." *Id. at* 849, (1998) (citations omitted).  See also see also *Wood v.*

5  *Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (even gross negligence is insufficient to

6  establish a constitutional violation).

7        The Third Claim, asserted against the County, alleges the County was deliberately

8  indifferent to the civil rights of the plaintiffs due to prior knowledge of the deputies' unjustified

9  use of deadly force against the mentally ill, the failure to properly train, supervise and discipline

10  the deputies despite that knowledge and after-the-fact ratification of the deputies' actions.  These

11  practices constituted a de facto policy or custom that was the moving force behind the alleged

12  constitutional violations.  (Complaint, ¶¶ 25 and 42.)

13        The first two claims allege conduct that could constitute criminal acts by the deputies.

14  The use of excessive force may constitute a battery or an attempted assault.  An assault "is an

15  unlawful attempt, coupled with a present ability, to commit a violent injury on the person of

16  another.  Calif. Penal Code § 240.  "A battery is any willful and unlawful use of force or violence

17  upon the person of another."  Calif. Penal Code § 242.  And under the substantive due process

18  standard discussed above, killing someone unrelated to any legitimate law enforcement purpose

19  is essentially an allegation of manslaughter.  Calif. Penal Code § 192(a):  "Manslaughter is the

20  unlawful killing of a human being without malice."  The Third Claim alleges the County's

21  <u>deliberate</u> indifference to plaintiffs' constitutional rights was a moving force behind the violation

22  of those rights.  The only two claims - the Fourth Claim for Wrongful Death and the Fifth Claim

23  for Negligent Infliction of Emotional Distress - are theoretically based on alleged negligent

24  conduct by the deputies, and even those claims are necessarily based on the shooting of

25  Jeremiah, clearly an intentional act, whether wrongful or not.

26        California cases require a heightened degree of foreseeability where the intervening force

27  is not merely negligent.  See *Wiener, supra,* at pp. 1149–1150.  See also *Juarez v. Boy Scouts of*

28  *America, Inc.* (2000) 81 Cal.App.4th 377, 394.  The cases finding criminal acts of third parties to

1   be superseding acts abound. In addition to those discussed above, in *Gonzalez v. Derrington*, 56

2   Cal.2d 130 (1961), the California Supreme Court held that a defendant who negligently sold

3   gasoline in an open case to a person who used it to set fire to an occupied bar was not liable as

4   the act of the arsonist was superseding. *Id.* at 133.

5        Even negligent intervening acts, however, break the chain of causation where the

6   negligence is unforeseeable, or highly extraordinary even if foreseeable. (Rest.2d, Torts, § 442.)

7   In *Schrimsher v. Bryson*, 58 Cal.App.3d 660 (1976), a highway patrol officer, investigating an

8   accident in which one of the drivers was under the influence of alcohol, ordered the drunk driver

9   to pull his car off the road. Another car, driven by another drunk driver, veered off the road and

10  struck the first drunk driver's car, propelling it into the officer. The officer sued the first drunk

11  driver. The Court held "[i]t would be an unwarranted extension of liability to hold that when a

12  traffic officer, who is issuing a citation, investigating an accident or performing other of his

13  duties, is injured as a result of the <u>negligence</u> or criminal conduct of one person, liability may be

14  imposed on the original traffic violator whose conduct brought the officer to the scene." *Id.* at

15  665. [Emphasis supplied.] The Court further stated that the action of the second drunk driver

16  "could not reasonably have been anticipated by defendant at the time of his initial negligence and

17  as a matter of law the chain of causation was broken." *Id.* at 664.

18       In *Martinez v. Vintage Petroleum*, 68 Cal.App.4th 695 (1998), plaintiff's coworkers,

19  employees of independent contractor, cut into a pressurized gas line, causing the pipe to burst

20  and injuring the plaintiff. The Court held the negligence of the coworkers was a superseding

21  cause, relieving the employer of liability, because it was both extraordinarily negligent and

22  dangerous. *Id.* at 701.

23       In *Premo v. Grigg*, 237 Cal.App.2d 192, 194 (1965), a dishwasher and janitor at a pizza

24  parlor brought his four-year-old daughter to work while he cleaned the premises. The employer

25  knew of this practice and tacitly allowed it. Preparatory to mopping the floor, the father filled a

26  bucket with hot water and carried it into the dining room where he left it unattended. A few

27  minutes later, he heard his daughter scream and found her immersed in the bucket. The child

28  died from the burns received from the scalding water. The Court held the negligent acts of the

1 father constituted a superseding cause as a matter of law, relieving the employer from liability.

2 *Id.* at 199.

3      A lumber company was insulated from liability in *Stultz v. Benson Lumber Co.*, 6 Cal.2d

4 688 (1936) even though the company supplied wood too defective to be used for scaffolding

5 with the knowledge it would be so used.  The employer's decision to use the wood, the defects of

6 which were obvious, was an intervening cause which broke the chain of causation.  *Id.* at 695.

7        5.   The Duty Imposed on the Hospital Was not Designed to Protect Against the
            Harm Suffered

8

9      The Restatement instructs that whether the result of the actor's conduct is highly

10 extraordinary and, thus, superseding, involves "determining whether the duty imposed on the

11 actor was designed to protect the one harmed from the risk of harm from the hazard in question.

12 However, courts frequently treat such problems as problems of causation."  Rest.2d, Torts,

13 §4352(2), com. c. [Internal citations omitted.]  Looking at this case from the standpoint of the

14 duty imposed on the hospital rather than causation, it is clear that the harm caused to Jeremiah

15 and his family by the deputies was not one the hospital's duty was designed to protect against.

16 The basis of the alleged duty to treat Jeremiah is asserted to be California Health & Safety Code

17 § 1317(a), which provides:

18

19       Emergency services and care shall be provided to any person requesting the
      services or care, or for whom services or care is requested, for any condition in

20       which the person is in danger of loss of life, or serious injury or illness, at any
      health facility licensed under this chapter that maintains and operates an

21       emergency department to provide emergency services to the public when the

22       health facility has appropriate facilities and qualified personnel available to
      provide the services or care.

23

24      The Legislature enacted § 1317, to accomplish three purposes.  One of the original

25 purposes of the statute, formerly § 1426, was to address the problem of patients being turned

26 away from emergency rooms because they had no health insurance.  Subdivision (d) of § 1317

27 provides in pertinent part: "Emergency services and care shall be rendered without first

28 questioning the patient or any other person as to his or her ability to pay therefor."  A second

1  purpose was to provide immunity to emergency health care providers in certain circumstances.

2  See, e.g., *Lowry v. Henry Mayo Newhall Mem'l Hosp.*, 185 Cal.App.3d 188 (1986); Health &

3  Safety Code § 1317(c), (f) and (g).

4        Finally, the Legislature also found the cost of providing emergency medical services was

5  greater than the cost of providing other medical services. "If allowed to continue, these higher

6  costs and lower reimbursements could force many physicians to reduce the quality and

7  availability of emergency medical services, to the detriment of Californians." Stats 1987, ch.

8  1240. Accordingly, "by enacting this legislation, the Legislature is providing a means of partial

9  funding for these vital services. Further, it is the intent of the Legislature that the source of

10  funding of emergency medical services be related to the incident of emergencies requiring

11  immediate medical care. Thus, this act will levy an additional penalty assessment on traffic and

12  other fines. In this way, the costs of emergency medical services shall be borne to a degree by

13  those who have a relationship to creating the emergencies." Stats 1987, ch. 1240.

14        There is no allegation that the intake coordinator advised Mrs. Chass that Jeremiah

15  probably would not be seen in the emergency room due to a lack of insurance. To the contrary,

16  the Third Party Complaint alleges that the coordinator advised Mrs. Chass to bring Jeremiah in

17  the following morning. The duty imposed on hospitals to provide emergency services regardless

18  of insurance coverage was not designed to protect against encountering peace officers who

19  would use excessive force. Thus, this analysis also leads to the conclusion that the harm

20  encountered was extraordinary.

21  **B.    Defendants Do Not Allege any Basis for a Duty to Jeremiah's Family**

22        Section 1317 provides only that hospitals that offer emergency medical care must provide

23  such care to persons requesting it or for whom such care is requested. It does not establish any

24  duty to the relatives of such persons. The Second, Fourth and Fifth claims are brought on behalf

25  of Jeremiah's parents and brother. On its face, § 1317 does not reach such persons and there is

26  no decisional law extending the duty encapsulated in § 1317 to such persons.

27        Common law duty precepts do not support liability on the part of the Hospital to the

28  Chass family either, even if pled. In *Burgess v. Superior Court*, 2 Cal.4th 1064 (1992), the

1  California Supreme Court, analyzing the "direct victim" branch of negligent infliction of

2  emotional distress held that a physician-patient relationship between the plaintiff and the health

3  care provider was critical to "direct victim" liability in the medical context. *Id.* at 1078, fn.8.

4  Earlier, in *Schwarz v. Regents of University of California,* 226 Cal.App.3d 149 (1990), the Court

5  of Appeal denied recovery for emotional distress to a father who alleged he was the direct victim

6  of a psychotherapist whom he had retained to treat his son and who helped the mother take the

7  son out of the country.  Because the Court found only the son was the therapist's patient, even

8  though the plaintiff father had participated in counseling sessions, it held the father could not

9  recover for negligent infliction of emotional distress. *Id.* at 161 163.  There is no allegation that

10 Jeremiah's family members were patients of the Hospital at all, let alone for any treatment at

11 issue in this lawsuit. Therefore, the Hospital did not owe them a legal duty.  In addition, the

12 contemporaneous awareness of an injury producing event is absent here and would bar a

13 "bystander" negligent infliction claim. *Thing v. La Chusa* (1989) 48 Cal.3d 644, 667-668 -

14 bystander must be "present at the scene of the injury producing event at the time it occurs and

15 then aware that it is causing injury to the victim."   At the time Mrs. Chass spoke to the intake

16 coordinator, she could not have been "then aware" that the coordinator's alleged advice was

17 producing injury since Jeremiah suffered no physical injury until he came into contact with

18 sheriff's deputies.

19        Also instructive is *Meighan v. Shore,* 34 Cal.App.4th 1025 (1995), wherein a wife,

20 believing her husband to be having a heart attack, implored the hospital to call a cardiologist who

21 did not show up for several hours after being called. As time passed, the wife, who had been

22 trained as a nurse, and who knew that certain medication was only effective during the early

23 hours of a heart attack, became hysterical and demanded that the nurses get a cardiologist in

24 immediately to examine her husband.  When a cardiologist finally arrived, he wrongly

25 determined that husband was not having heart attack and, accordingly, did not administer

26 medication that might have prevented damage to the heart.  The court found the wife had no

27 viable bystander cause of action because the facts did not "satisfy the witness and awareness

28 requirement of *Thing.*" *Id.* at 1045.

1    Medical professionals normally owe no duty of care to third parties who might suffer

2  reasonably foreseeable harm as a result of medical negligence. See *Calderon v. Glick* (2005)

3  131 Cal.App.4th 224, 233 [affirming order granting summary judgment in favor of

4  psychotherapist in action for wrongful death and professional negligence where

5  psychotherapist's patient shot five members of former girlfriend's family]. Because the Hospital

6  here is neither a concurrent nor a joint tortfeasor with respect to plaintiffs' injuries, defendants

7  cannot assert a claim for equitable indemnity for the Second, Fourth, or Fifth claims. *Munoz v.*

8  *Davis*, 141 Cal. App. 3d 420, 425 (1983) ["Whatever confusion may have existed in the case law

9  of equitable indemnity [citation], one point stands clear: there can be no indemnity without

10  liability. In other words, unless the prospective indemnitor and indemnitee are jointly and

11  severally liable to the plaintiff there is no basis for indemnity."]; *Seamen's Bank v. Superior*

12  *Court*, 190 Cal. App. 3d 1485, 1491 (1987) [applying *Munoz v. Davis, supra*, 141 Cal. App. 3d

13  420, to reject claim for equitable indemnity].

14    **C.    An Intentional Tortfeasor May Not Seek Equitable Indemnity from a Negligent**
       **Tortfeasor**
15

16    "The right of what may be termed equitable indemnity [citation] enures to a person who,

17  <u>without active fault on his part</u>, has been compelled by reason of some legal obligation to pay

18  damages occasioned by the initial and active negligence of another. This involves the equitable

19  considerations of primary and secondary liability, or, to put it differently, concepts of active and

20  passive conduct." *S.F. Examiner Division v. Sweat*, 248 Cal.App.2d 493, 497 (1967). [Emphasis

21  added.]

22    A tortfeasor guilty of an intentional tort may not seek indemnification for any amount of

23  the judgment from a negligent tortfeasor. *Leko v. Cornerstone Bldg. Inspection Service*, 86

24  Cal.App.4th 1109, 1120 (2001) [cross-complaint for equitable indemnity proper only insofar as

25  it seeks relief from liability for negligence or other nonintentional torts]; *Weidenfeller v. Star &*

26  *Garter*, 1 Cal.App.4th 1, 6-7 (1991) ["intentional actor cannot rely on someone else's negligence

27  to shift responsibility for his or her own conduct"]; see *PPG Industries, Inc. v. Transamerica Ins.*

28  *Co.*, 20 Cal.4th 310, 319 (1999) [recognizing strong public policy against permitting liability for

1    intentional wrongdoing to be offset or reduced by the negligence of another]; see also Calif.

2    Code Civ. Proc., § 875(d) ["There shall be no right of contribution in favor of any tortfeasor who

3    has intentionally injured the injured person."].

4        As previously noted only two claims ostensibly involve negligence here.  Defendants

5    cannot seek to shift liability for their conduct on the civil rights claims - which conduct would be

6    analogous to several crimes if true - to shift responsibility onto the Hospital, which is only

7    alleged to be negligent.  As to the two state law claims, defendants are not entitled to indemnity

8    because they have not alleged any legally cognizable duty on the part of the Hospital to the

9    Chass family, as argued above.

10   **D.    The Hospital Cannot Be the Actual Cause of the Alleged *Monell* Violations**

11       Plaintiff's Third Claim is based on *Monell v. Department of Social Services*, 436 U.S.

12   658, 691 (1978), which held that a local government entity may not be held responsible for the

13   acts of its employees under a respondeat superior theory of liability.  Rather, to state a claim for

14   municipal or county liability, a plaintiff must allege that a policy or custom of the local

15   government entity was a moving force behind the alleged constitutional deprivation.  *City of*

16   *Canton, Ohio, v. Harris*, 489 U.S. 378, 385 (1989).

17       The *Monell* claim here is based on allegations that the Sheriff's Department failed to

18   train, supervise and discipline the two deputies and other deputies despite prior knowledge of

19   their use of excessive force against mentally ill individuals.  Alternatively or additionally, the

20   *Monell* claim is based on ratification of the conduct after the event.  Whatever the legal impact of

21   the Hospital's alleged conduct on the night of March 11, it cannot have been the actual cause of

22   the Sheriff's Department's failure to train, supervise or discipline its officers prior to their

23   encounter with Jeremiah on March 12.  Nor can the Hospital's conduct have been the actual

24   cause of the Department's alleged subsequent ratification of the deputies' actions.

25       Actual cause exists where a defendant's conduct was "'a substantial factor in bringing

26   about the injury.'"  *Mitchell v. Gonzales,* 54 Cal. 3d 1041, 1049 (1991).  Actual cause is often

27   declared to be an issue of fact; however, it may be decided as a question of law if, under

28   undisputed facts, reasonable minds would reach but one conclusion.  *Kurinij v. Hanna &*

1    *Morton*, 55 Cal.App.4th 853, 864 (1997); *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287

2    F.Supp.2d 1118, 1200 (C.D.Cal. 2003). Reasonable minds could not differ here. The Hospital is

3    not alleged to have played any role whatsoever in the prior training, supervision, or discipline of

4    deputies regarding their use of force against mentally ill individuals. Nor is the Hospital alleged

5    to have played any role in the Sheriff's Department's subsequent ratification of the deputies'

6    actions during their encounter with Jeremiah. Actual cause does not exist for the Third Claim as

7    a matter of law.

8    **V.    CONCLUSION**

9        For all of the foregoing reasons, Santa Rosa Memorial Hospital respectfully requests that

10    the Court dismiss defendant's Third Party Complaint without leave to amend and for such other

11    and further relief as the Court deems appropriate.

12

13    Dated: September 3, 2008                              TATE & ASSOCIATES

14

15                                        By _____

16                                           Lauren E. Tate,
                                             Attorneys for Defendant SANTA ROSA
                                             MEMORIAL HOSPITAL

17

18

19

20

21

22

23

24

25

26

27

28

---

DEFENDANT SANTA ROSA MEMORIAL HOSPITAL'S AMENDED MOTION TO DISMISS THIRD PARTY COMPLAINT
[Fed. R. Civ. Proc. 12(b)(6)]

18